Bissell, J.,
delivered the opinion of the court.
The right construction of the agreement which the parties made about the rent of the demised premises, and the judgment which we have formed of the legal effect of their acts at the time of the surrender, render all other matters immaterial.
Carson & Co., occupied either as owners or lessees, the premises, 820 16th street, in Denver. In 1890 by a written instrument, the terms of which need not be set out, they leased the one third front of the store to Arvantes Brothers at a monthly advance rental of $250. To secure the punctual performance of this engagement the lessees gave a mortgage for $7,200 on a section of land in Nebraska. Having entered under the lease they continued to occupy until about the 2d of June, 1894. At that date, desiring to sell the Nebraska property, they negotiated with Carson & Co. to secure the release of the incumbrance. An arrangement was *384 made by which the mortgage was released and Arvantes Brothers then deposited with their landlords #250, taking for it a receipt which thereafter formed the security contract. In general terms the memorandum recited the receipt of #250 from Arvantes Brothers as security that they would remain in the store until the end of the lease, paying their rent in advance, and provided that if they moved out of the store and did not pay rent according to the agreement the deposit should be forfeited and become the possession of Carson & Co., but in case of fulfilment the money was to be returned. Later and about the 20th of June, Arvantes Brothers found a purchaser for their stock in trade and good will and lease, one, W. L. Hallett. The trade was made between Arvantes Brothers and Hallett through a broker, and the stock was sold to Hallett at an agreed price though on the basis of leaving the deposit with Carson & Co., as a continuing security for Hallett’s performance of his obligation. Before the trade was actually made the parties attempted to procure the assent of Carson & Co. to the transfer of the lease and the acceptance of Hallett as a tenant in place of the Arvantes Brothers. The lessors refused to assent except on the payment of a bonus. It was finally arranged that if Arvantes Brothers would pay Carson & Co. #25.00, they would accept Hallett as a tenant in place of the original lessees. It was paid and on the 22d of June, Carson & Co. executed an agreement as follows: “ This is to certify that we hereby accept W. L. Hallett as tenant instead of Arvantes Bros., and on the same conditions.” Hallett thereupon went into possession and paid rent for the balance of that month and up to the 1st of September; at that time through depression in business or otherwise, he became unable to carry out his obligation and notified Carson & Co. that he could no longer pay the rent. Thereupon the original lessees were notified and they were told that their #250 Avould be forfeited if they did not take the store and pay the rent. The opportunity was given them to re-enter and occupy, and pay as they might choose by the day, week or month. The offer was *385 declined and they made some statements substantially that they would rather forfeit $250 than take possession. We do not further state these particular transactions because as we view it what the parties did determined their rights and ended their mutual obligations. When it was finally .concluded the rent would not be paid and that the subsequent tenant Hallett was financially irresponsible, Carson & Co. entered into negotiations with him to save themselves from loss. The result was Hallett' moved out, surrendered possession and turned over his stock of goods to Carson & Co., who sold them and applied the proceeds to the payment of the expenses of sale, the outstanding light bills and other incidental expenses ; the rent due up to the 11th of September when they assumed possession, and paid the balance $28.15 to him in cash. This appears from a statement which they furnished showing the sums received from the sale of the stock and the disbursements. Carson & Co. then took absolute possession of the premises, tore down the partitions, put the store in condition and made it a part of their own premises and from that time forward occupied the whole of them. This is a full statement of the facts to which the law must be applied.
Much learning has been expended in the endeavor to determine the effect to be given to contracts between parties with respect to those provisions which have declared deposits of this description to be liquidated damages, or which provided for the forfeiture of the security in case of a breach of the agreement. The determining consideration always seems to be the purpose of the parties and the object of the agreement. Wherever the damages are uncertain and indefinite in their nature and extent, and the amount specified does not appear to be unreasonable, the courts incline to the view that in this case the amount shall be taken as liquidated damages, and may be recovered in their entirety in case of a breach. But whether the amount is to be taken as liquidated damages or a penalty is always dependent on the intention of the parties. This must be ascertained from *386 a consideration of the nature of the contract, the circumstances of its execution and the purposes which led to it. Viewed in the light of these principles neither the mortgage originally-executed nor the subsequent receipt and deposit given to take its place permit us to treat the money deposited as liquidated damages. It would scarcely be contended that if the mortgage had remained and the parties had abandoned the premises Carson & Co. would have had a right to foreclose the mortgage and appropriate the result to their own benefit regardless of the damage which they had sustained. The mortgage itself was for $7,200. If it was assumed that the default was absolute and the lessors had remained out of possession and held Arvantes Brothers for the rent, the utmost resulting damage would have been the loss of the rent of the store according to their contract from the date of default to the expiration of the term. This would not have been equal to the expressed value of the security, nor would it have been the equivalent of its probable value. Again, the damages the lessors might sustain were easy of computation, definite in amount and certain in their character. Aside from these particular considerations it was evidently the purpose and intention of the parties simply to take security for the rent. Such was the form of the engagement, such the expressed intention of the parties, and such the legal effect of the various agreements into which they entered. It follows that if we concede the breach as the appellants alleged it and attempted to prove it they could only withhold so much of the deposit as would equal the proven damages. Chaude v. Shepard, 122 N. Y. 397.
Such being the law, Arvantes Brothers in this suit were entitled to recover the .amount of their deposit, except as it might be reduced by proof of damage which had not been otherwise satisfied. Treating the deposit then as security to which these consequences attach we must next ascertain whether the subsequent acts of the lessors defeated any claim which they might have had to any part of the money. An agreement by the tenant to abandon possession of the *387 demised premises and one by the landlord to resume his occupancy and the execution of this agreement in law amounts to a surrender of the term. Whenever this happens the lease is terminated and the obligation of the tenant to occupy or to pay rent is thereupon determined. This is familiar law with reference to leasehold rights and is thoroughly well settled. Talbot et al. v. Whipple, 96 Mass. 177; Kneeland v. Schmidt, 78 Wis. 345; Hegeman v. McArthur, 1 E. D. Smith, 147; Rice v. Dudley, 65 Ala. 68; Buffalo County National Bank v. Hansen, 34 Neb. 455.
Under this rule the landlord of course has his election between one of two remedies. He may leave the premises vacant, sue for the rent for- the balance of the term and enforce any security which the lessee gave to insure performance. If he chooses he may likewise terminate the contract' and enter a claim for rent up to the date of the abandonment and the acceptance of possession. He is not at liberty to take possession of the premises, and at the same time insist that the contract is in force and recover rent for the balance of the term. Under this rule the appellants were without defense. This is true whether the deposit is treated as security for the performance of the original agreement, or as security also for Hallett’s obligation. There might be some question whether the acceptance of Hallett as a tenant did not terminate the obligation of Arvantes Brothers, but should we enter on a discussion of that question we might be compelled to determine whether the parties actually agreed that the deposit should remain as security for him. Since the question is wholly unimportant we neither consider nor decide it. Our conclusions are based on what the parties did when Hallett abandoned the premises. At that time by a specific agreement between Hallett and Carson & Co., he sold them his stock to liquidate any claim against him for rent. Carson & Co. accepted the situation, took the stock in the store, sold it, applied the proceeds to the payment of the expenses of the sale, to the satisfaction of their claim for services in selling the stock out and the- payment of out *388 standing claims on the premises, and then accounted to him for the difference and went into possession. The intention to accept the abandonment and end the term is fully established by what Carson & Co. did. After Hallett’s stock was sold they tore down the partition which made the premises capable of independent occupancy and thereafter occupied it. No more complete evidence of an intention to abandon and an acceptance of the possession has been exhibited by ■any case to which our attention has been called. In law this was a termination of the tenancy, and thereafter Carson & Co. had no claim on either Hallett or Arvantes Brothers for rent. Since this is true and the deposit was only left with them as security for performance and the obligation to perform no longer rested on either the original tenant or the subsequent one, and all rent for the time during which the premises were occupied was liquidated, the deposit then became the money of Arvantes Brothers and they had a right to maintain suit for its collection. This they did and got judgment and we know of no principle on which this conclusion can be disturbed.
There are some minor questions as we view them argued on the appeal and on which primarily it is rested. These questions all concern the admission and rejection of testimony and the instructions which the court gave to the jury. Since we are compelled by statute to disregard any errors which do not affect the substantial rights of the parties, and we are unable to see that a different procedure in the lower court would have brought about a different result, we are not at liberty because of these matters, even though we should concede them to be errors, to reverse the case. We are quite ready to concede counsel’s proposition that the rejection of material testimony and the admission of incompetent testimony must as a general rule constitute prejudice on which a case must be reversed. The trouble with the application of it is, that while the testimony would have been admissible under some circumstances and while under others it might perhaps have had a tendency to determine the verdict of the *389 jury, yet this concession does not affect this case. When we conclude the contract was one of security and that there was in law a surrender of the term, the rights of the parties are thereby completely determined and it is really of little consequence what was said or done between them during the pendency of the negotiations which brought about this result, or what was said and done by the parties at the time the agreements were originally made. All these matters culminated in written agreements to which the law attaches certain specific consequences, and all evidence respecting collateral or antecedent matters is thereby rendered, if not incompetent, wholly immaterial. The court submitted to the jury the question of a surrender and no verdict which had found otherwise on this testimony could have been sustained.
The appellants asked one instruction respecting the right of the jury to disregard the testimony of one of the Arvantes, if they should conclude that he had testified falsely. The court did not give the instruction in that form nor did it give any exact equivalent of it, although one was given which substantially left it to the jury to determine whether the witness had testified truthfully or falsely, and were told they might disregard his evidence should they reach the latter conclusion. The refusal to give the instruction asked is not prejudicial error because the matters about which it is claimed he testified falsely were as we have already determined immaterial matters concerning which his evidence was wholly unimportant. We are therefore unable to see that the refusal to give this particular charge constituted an error for which the case must be reversed.
It is insisted that the verdict is excessive because the jury returned a verdict for more interest than the plaintiff was entitled to recover for the withholding of the money. The lease ran to the 1st of January, T895. It is assumed that interest should be computed from that date to the date of the verdict in July and not from the time of the surrender of the premises on the 11th of September, 1894. If this contention was correct the verdict would be excessive to *390 the extent of $7.97. But when we conclude the engagement terminated on the 11th of September to which time the appellants had been paid, at that date a right of action arose in favor of the Arvantes Brothers, who could insist on the repayment to them of the $250 which had been deposited. If the interest is computed from that date to the date of the verdict, the 9th day of July, 1895, the excess could not amount to more than fifty-five cents. We are unable to take notice of such an immaterial discrepancy. Even if we should concede plaintiff was only entitled to interest according to the claim indorsed on the summons issued by the justice where the suit was originally commenced and that it was excessive to the extent of the plaintiffs’ claim and interest should only have been allowed from the 21st of January, we are unable to see that the question is so preserved as to entitle the appellants to insist on it. We are not at all clear the plaintiffs were not entitled to the verdict. If they were not the difference is so slight as to be immaterial and the appellants are not in a position to avail themselves of the discrepancy.
We cannot discover any error in the record which affects the substantial rights of the parties and the judgment will therefore be affirmed.

Affirmed.