Jakob SCHNEIKER, Petitioner,

v.

Darrell W. GORDON and Gary F. Peterson, Respondents.

No. 85SC33.

Supreme Court of Colorado, En Banc.

Feb. 9, 1987.

Hart & Trinen, Donald T. Trinen, Stephanie M. Smith, Denver, for petitioner.

No appearance for respondents.

LOHR, Justice.

This case requires us to consider the interrelation of the law of contracts and the law of property in determining the obligations of a sublessee for payment of rent after termination of a sublease by abandonment and surrender. We granted certiorari to review the decision of the Colorado Court of Appeals that the termination of a sublease ended the sublessee's obligation to pay future rent. *Gordon v. Schneiker*, 699 P.2d 3 (Colo.App.1984). We disagree with that decision and conclude that the rights and obligations of the parties to the sublease with respect to the covenant to pay rent survived the termination of the sublease and that the sublessee is liable for contract damages caused by breach of that covenant. We therefore reverse.

## I.

Sometime before July of 1979, the defendant in this action, Jakob Schneiker (lessee-sublessor), entered into a lease (the primary lease) with the owner of certain property for use of the leased premises as a car wash. The property included a structure and attached equipment. Rent under the primary lease was payable at the rate of $600 per month, and the term of the primary lease was to extend through May of 1983.

On April 1, 1980, the lessee-sublessor entered into a sublease with the plaintiffs, Darrell W. Gordon and Gary F. Peterson (sublessees). The sublease provided for a monthly rent of $1900 and was for a term ending at the same time as that of the primary lease. The sublease specified that the premises were to be operated as a car wash. In addition to containing a provision that the sublessees would keep the premises and equipment in good repair, the sublease also contained a "Repossession" clause which provided:

> The parties agree that in case said premises are left vacant and any part of the rent herein reserved be unpaid, then the Lessor may, without in anyway being obliged to do so, and without terminating this lease, retake possession of said premises, and rent the same for such rent and upon such conditions as the Lessor may think best, making such changes and repairs as may be required, giving credit for the amount of rent so received less all expenses of such changes and repairs, and said Lessee shall be liable for the balance of the rent herein reserved until the expiration of this lease.

After July of 1981, the sublessees ceased making rental payments, and they abandoned the premises in August of 1981. Prior to mid-November of that same year, the sublessees mailed the keys for the car wash to the lessee-sublessor. In November the lessee-sublessor reentered the premises. The equipment was in such a state of disrepair that the property could not be operated as a car wash. The trial court found that the sublessees had breached their obligation to maintain and repair the equipment, that the reasonable cost of repairs was more than $6000, and that the reasonable rental value of the property was less than $600 per month. Being unable to afford to make the necessary repairs, the lessee-sublessor negotiated a surrender of the primary lease with the owner as of February 1982.

The sublessees brought suit against the lessee-sublessor, claiming misrepresentation on the part of the lessee-sublessor concerning the profitability of the car wash business, and requesting compensatory and punitive damages. The lessee-sublessor counterclaimed for damages caused by the sublessees' breach of the sublease and requested the full rent of $1900 per month from the time the sublessees ceased making rental payments, August of 1981, through the expiration of the lease, May of 1983. The case was tried to the court. After presentation of the sublessees' evidence, the trial court dismissed their claim. At the conclusion of the trial, the court awarded the lessee-sublessor partial relief on his counterclaim. The court found that the lessee-sublessor had acted to mitigate his damages by negotiating a surrender of the primary lease and that the lessee-sublessor had intended to hold the sublessees liable for the entire rent payable through the expiration of the sublease. However, the trial court held that the cancellation of the primary lease acted as a surrender and termination of the sublease as a matter of law, and that the lessee-sublessor was therefore entitled only to rent payable up until February 1, 1982, the date the primary lease was terminated by surrender.[1]

---

1. The trial court also awarded the lessee-sublessor $6,118.78 as damages to the equipment, less the prepaid last month's rent of $1900 and the security deposit of $4000. Prior to the determination of allowable attorneys' fees, the sublessees declared bankruptcy. The trial court nevertheless determined that the lessee-sublessor was entitled to $13,350 as reasonable attorneys' fees. The portions of the award described in this footnote are not at issue in this certiorari review.

The lessee-sublessor appealed the denial of damages for the profits he would have received during the remainder of the original term of the sublease, from February of 1982 through May of 1983. The court of appeals affirmed the judgment of the trial court, holding that the surrender of the primary lease operated as a surrender and termination of the sublease as a matter of law, and that the sublessees' obligation to pay future rent ended when the sublease was terminated since there was no express agreement between the parties that the obligation to pay rent would survive termination of the sublease. The lessee-sublessor then filed a petition for certiorari with this court, and we granted that petition.

## II.

### A.

The law governing the relationship between landlord and tenant has ancient roots in the common law of England. *See generally* 1 *American Law of Property* § 3.1 (Casner ed. 1952); 2 R. Powell, *The Law of Real Property* ¶ 221[1] (1986); Hicks, *The Contractual Nature of Real Property Leases*, 24 Baylor L. Rev. 443, 446–53 (1972). The tenant was initially regarded as having rights that were solely contractual in nature. The tenant did not have a sufficient relationship to the land to permit him to avail himself of the common law forms of action that could be utilized by freeholders to protect their interests against third parties. 1 *American Law of Property, supra,* § 3.1, at 175–76; Hicks, *supra,* at 449. As a consequence, in its very early history a lease had "primarily a contractual significance, rather than a property significance." 2 R. Powell, *supra,* ¶ 221[1], at 178–79. With the passage of time, however, the tenant gradually was given the right to bring certain real causes of action, such as ejectment, and the tenant came to be regarded as possessing an interest in land. 3 G. Thompson & J. Grimes, *Thompson on Real Property* § 1028, at 84 (1980 repl. vol.); 1 *American Law of Property, supra,* §§ 3.1, 3.11; Hicks, *supra,* at 449–50. By the beginning of the sixteenth century the law had undergone such change that "the lease was asserted to be essentially a conveyance, rather than a contract." 2 R. Powell, *supra,* ¶ 221[1], at 179. *See* Hicks, *supra,* at 449–51.

In modern times, however, covenants in leases have become more numerous and complex, reflecting the growing importance of structures on the land and the burgeoning complexities of an increasingly urban society. 2 R. Powell, *supra,* ¶ 221[1], at 180–81; Hicks, *supra,* at 451–52. Therefore, while the modern lease remains a conveyance of an interest in land, it typically possesses many of the characteristics of a contract. 1 *American Law of Property, supra,* § 3.11, at 202–03. Particularly with regard to business or commercial leases, the contractual aspects of the landlord-tenant relationship have become increasingly important. 2 R. Powell, *supra,* ¶ 221[1], at 180–87.

The dual nature of a lease, as both a contract and a conveyance of an interest in land, contains important implications for resolving disputes between landlords and tenants. Courts and commentators have noted the differences between the results that flow from analyzing the rights and obligations of parties to a lease by use of property law principles and those that are achieved by recognizing contract principles as influential or controlling in the analysis. *See, e.g., MAR–SON, Inc. v. Terwaho Enterprises, Inc.,* 259 N.W.2d 289, 291 (N.D.1977); *Wright v. Baumann,* 398 P.2d 119, 120–21 (Or.1965); D. Dobbs, *Handbook on the Law of Remedies* § 12.6, at 828–29 (1973); 2 R. Powell, *supra,* ¶ 221[1], at 180–87; Hicks, *supra;* Love, *Landlord's Remedies When the Tenant Abandons: Property, Contract, and Leases,* 30 U.Kan.L.Rev. 533 (1982). However, as a result of the dual nature of a lease, neither contract principles nor property principles can be exclusively relied upon to govern the resolution of all issues. One leading authority has described the modern law governing landlord-tenant relationships as follows:

[T]he present law of leases is a blend of property concepts and of contractual doctrines, made for the service of a wide variety of objectives; agrarian, urban and financial. This historical background makes it clear that we can expect varying proportions of these basic ingredients in the decision of cases litigated now and in the future. Any fixity of proportions would destroy the elasticity of the law, which is, at once, its glory, its challenge and its factor of uncertainty.

2 R. Powell, *supra*, ¶ 221[1], at 187. Whether contract principles, property principles, or a blend of both control the resolution of a particular case depends largely on the intent of the parties, the interests of society, and the relative fairness of the results to be achieved through selection among the potentially applicable principles. *See Javins v. First National Realty Corp.*, 428 F.2d 1071, 1074–75 (D.C.Cir.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Sommer v. Kridel*, 74 N.J. 446, 378 A.2d 767, 770–73 (1977). *See generally* Hicks, *supra*.

The present case directs our attention to the law of landlord and tenant as it relates to abandonment and surrender of a leasehold and the obligation of a lessee for rent following abandonment. Under the common law view of a lease as a conveyance, a tenant's obligation to pay rent was based upon the ownership of the leasehold estate. *See, e.g.*, Love, *supra*, at 535. The rent was said to issue from the land. Therefore, so long as the tenant owned the leasehold estate the rental obligation continued, but when the leasehold was extinguished, for whatever reason, the obligation ceased. As a result, if the landlord elected to accept the surrender of the premises upon abandonment by the lessee, the lease was terminated and there was no continuing obligation for rent. *Id.* at 535–36. *See also* 1 *American Law of Property, supra*, § 3.99; 3A G. Thompson & J. Grimes, *Thompson on Real Property* §§ 1343–45 (1981 repl.)

vol.); 4 H. Tiffany, *The Law of Real Property* § 963 (3d ed. 1975). On the other hand, the landlord could decline to accept the offer of a surrender that was implicit in abandonment and could continue to hold the tenant liable for rent as it became due. 3A G. Thompson & J. Grimes, *supra*, § 1345, at 641; Love, *supra*, at 535. Our early cases, reflecting this traditional property law analysis, recognized these two alternatives available to the landlord upon abandonment of the premises by the tenant. *E.g., Ruple v. Taughenbaugh*, 72 Colo. 171, 210 P. 72 (1922); *Carson v. Arvantes*, 10 Colo.App. 382, 50 P. 1080 (1897), *aff'd*, 27 Colo. 77, 59 P. 737 (1899).[2]

Before courts began to recognize that contractual principles are relevant to the determination of a landlord's rights on abandonment by a tenant, a landlord could not rely on the contract doctrine of anticipatory repudiation to recover installments of rent that would have accrued but for the abandonment and surrender. Nor could a tenant successfully maintain that a landlord's right to collect rent accruing after abandonment, in the absence of an acceptance of the tenant's surrender, should be subject to a duty to mitigate damages by using reasonable efforts to secure a substitute tenant. 1 *American Law of Property, supra*, § 3.11, at 203; Love, *supra*, at 535–36. *See* Weissenberger, *The Landlord's Duty to Mitigate Damages On the Tenant's Abandonment: A Survey of Old Law and New Trends*, 53 Temple L. Q. 1 (1980); Annotation, *Landlord's Duty, On Tenant's Failure to Occupy, or Abandonment of, Premises, to Mitigate Damages by Accepting or Procuring Another Tenant*, 21 A.L.R.3d 534 (1968).

The traditional emphasis of the courts on the lease as a conveyance, to the exclusion of its contractual characteristics, has generated much criticism by commentators. *E.g.*, 1 *American Law of Property, supra*, § 3.11; Hicks, *supra*; Love, *supra*;

---

**2.** The *Restatement (Second) of Property*, Landlord and Tenant § 12.1 (1977), takes a similar position but also would permit a landlord to relet the premises and hold a tenant liable for the difference in rent regardless of whether the lease contains a provision allowing him to do so, so long as the landlord first notifies the tenant.

McCormick, *The Rights of The Landlord Upon Abandonment Of The Premises By The Tenant,* 23 Mich.L.Rev. 211 (1925); Weissenberger, *supra.* In recognition of the increasing importance of the covenants found in modern leases, as well as the policy of discouraging economic and physical waste, courts in recent times have begun to look to principles of contract law in analyzing the rights and obligations of a landlord and a tenant upon abandonment of premises by a tenant. *E.g., Danpar Associates v. Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 438 A.2d 708 (1980); *Wichita Properties v. Lanterman,* 6 Kan. App.2d 656, 633 P.2d 1154 (1981); *Bernstein v. Seglin,* 184 Neb. 673, 171 N.W.2d 247 (1969); *Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977); *MAR-SON, Inc. v. Terwaho Enterprises, Inc.,* 259 N.W.2d 289 (N.D.1977); *Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965); *United States Rubber Co. v. White Tire Co.,* 231 S.C. 84, 97 S.E.2d 403 (1956). In the jurisdictions in which these cases were decided, acceptance of surrender acts to terminate the privity of estate between the parties but the privity of contract between them is held to be unaffected. *See, e.g., United States Rubber Co.,* 97 S.E.2d at 409; *see also* McCormick, *supra,* at 216–17; Hicks, *supra,* at 521–22. Therefore, while a landlord can no longer maintain an action for rent due after termination of the lease in these jurisdictions, he can maintain an action for contract damages caused by the tenant's breach of the lease. *Danpar Assoc.,* 438 A.2d at 709–10; *United States Rubber Co.,* 97 S.E.2d at 409.

Colorado law in this area, though once exclusively rooted in property law principles, has gradually come to recognize that contract principles can sometimes play a role in resolving landlord-tenant disputes. Our early cases, which viewed a lease as a conveyance and rent as an incident of the tenancy, contain no suggestion that the landlord has any responsibility to mitigate damages by exercising reasonable efforts to find a substitute tenant as a condition to recovering the full amount of rent specified in the lease after a tenant abandons the property. *See, e.g., Ruple v. Taughenbaugh,* 72 Colo. 171, 210 P. 72 (1922); *Carson v. Arvantes,* 10 Colo.App. 382, 50 P. 1080 (1897), *aff'd,* 27 Colo. 77, 59 P. 737 (1899). Nor is there any intimation in those cases that the contract doctrine of anticipatory repudiation might be available to enable a landlord to collect damages caused by the tenant's abandonment, including an amount equal to the rent the landlord would have received had the tenant not breached the lease. *See id.*

In more recent times, however, we have held that if a lease expressly permits, the landlord may relet the premises abandoned by the tenant on the tenant's account and hold the tenant liable for the difference between the rent required by the original lease and the rent paid by the substitute tenant. *Ruston v. Centennial Real Estate,* 166 Colo. 377, 445 P.2d 64 (1968). *Accord McArthur v. Rostek,* 483 P.2d 1351 (Colo.App.1971) (not selected for official publication); *Grolier Society, Inc. v. International Realty Co.,* 482 P.2d 394 (Colo. App.1971) (not selected for official publication). In *Ruston,* we stated that "[a] lease, like other contracts, is to be reasonably interpreted according to the apparent intention of the parties." 166 Colo. at 381, 445 P.2d at 66. *See also Aigner v. Cowell Sales Co.,* 660 P.2d 907 (Colo.1983); *GTM Investment v. The Depot, Inc.,* 694 P.2d 379 (Colo.App.1984). Then, in *Shanahan v. Collins,* 189 Colo. 169, 539 P.2d 1261 (1975), we noted that at common law the real estate lease developed in the field of real property rather than contract law but that rigid adherence to the law of property to determine the duties and obligations of the parties, implied as well as expressed, was no longer the proper approach in resolving all landlord-tenant disputes. *Id.* at 171, 539 P.2d at 1262. In that case we held, contrary to traditional property law analysis, that a tenant's obligation to pay rent is not independent of a landlord's covenant to make improvements or repairs. *Id.* at 172, 539 P.2d at 1263. As a result, the tenant was entitled to set off against the rent payments the cost of repairs that the

landlord had refused to make although required to do so by a covenant in the lease. *Id.*

In summary, *Ruston* recognized that a lease is both a contract and a conveyance of an interest in land and that, as parties to a contract, a landlord and a tenant may agree to any legally enforceable remedy. *Shanahan* went on to recognize that contract principles may be applied in certain circumstances to resolve disputes between a landlord and a tenant even when the parties have not expressly agreed to the rules to be employed in resolving those disputes.

### B.

The case now before us requires us to consider once more the dual nature of a lease as contract and conveyance and to determine the implications of that dual nature for the liability of a subtenant for rent after abandonment. The sublease, in the "Repossession" clause previously referred to, specifically authorized, but did not obligate, the lessee-sublessor to retake possession, make changes and repairs, and rerent, without terminating the lease, after the sublessee departed leaving the premises vacant. The amount of the new rent less the cost of changes and repairs would be credited against the continuing obligation of the sublessee to pay the rent specified in the sublease. Upon examination of the premises after the sublessee's departure, however, it became apparent that the sublessee had left the premises in such a state that the lessee-sublessor would not be able to relet the premises without making substantial repairs. Due to a lack of funds and an inability to borrow, the lessee-sublessor could not afford to make these repairs. The ability of the

lessee-sublessor to relet the premises was also adversely affected by the relatively short period of time remaining between the sublessees' departure in August 1981 and the end of the primary term in May 1983. Therefore, the trial court found that the reasonable rental value of the unrepaired premises was less than the $600 monthly rent payable by the lessee-sublessor to the owner-lessor over the remainder of the term of the primary lease.

■ Had the premises been in a condition permitting rerental on an economic basis, the lessee-sublessor could have elected to pursue his remedy under the "Repossession" clause. *See Ruston v. Centennial Real Estate,* 166 Colo. 377, 380-81, 445 P.2d 64, 66 (1968). However, the terms of the "Repossession" clause implicitly apply only to circumstances in which repair and rerental is physically and economically feasible. Therefore, the actions of the sublessee rendered this remedy unavailable to the lessee-sublessor.[3]

Being unable to make the necessary repairs or to relet the premises at an economically prudent rate, the lessee-sublessor was faced with a difficult choice. Under our early case law, he could have elected to refuse to accept the sublessees' surrender. He then could have continued to pay the $600 per month rent under the primary lease and could have held the sublessees liable for the $1900 per month rent reserved in the sublease as it became due. *See Ruple v. Taughenbaugh,* 72 Colo. 171, 210 P. 72. Rather than pursuing that uneconomic course of action, the lessee-sublessor negotiated a surrender of the primary lease, thereby eliminating the obligation to pay rent on that lease and mitigating the

---

**3.** Even had the lessee-sublessor been able to rerent the premises and proceed against the sublessee under the "Repossession" clause, he would not have been required to do so to the exclusion of all other possible remedies. "When a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law." *McDonald v. Stockton Metropolitan Transit District,* 36 Cal.App.3d 436, 111 Cal.Rptr. 637, 642 (1973). *Accord* A. Corbin, *Corbin on Contracts* § 1227 (1964). The sublease contains no express or implied provision that the "Repossession" clause is intended to be the exclusive remedy available to the lessee-sublessor upon abandonment of the premises by the sublessee. In fact, the "Repossession" clause expressly states that the lessee-sublessor is under no obligation to proceed under its terms.

loss resulting from the failure of the sublessees to pay rent to $1300 per month.

Were we to view these facts solely under traditional property law principles, as did the trial court and the court of appeals, we would agree with those courts that the primary lease was extinguished by surrender and acceptance and that the surrender and acceptance of the primary lease was so inconsistent with the continuation of the rights of the lessee-sublessor under the sublease that it constituted an acceptance of the sublessees' surrender of the sublease. *See First National Bank v. Rogers*, 50 Nev. 325, 258 P. 1024 (1927); 2 R. Powell, *supra*, ¶ 247[5], at 372.171. Traditionally, surrender and acceptance not only caused the leasehold estate to be absorbed into the lessor's reversion but also terminated the obligation of the lessee for rent that would have accrued subsequent to the surrender. 1 *American Law of Property*, *supra*, § 3.99; *Ruple*, 71 Colo. at 173, 210 P. at 73. As we said in *Shanahan v. Collins*, however, when faced with an appeal to apply traditional property law principles with respect to the independence of leasehold covenants, "[w]e do not consider this to be the proper approach to the problem presented here." 189 Colo. at 171, 539 P.2d at 1262.

We believe that it is necessary to recognize the dual nature of the lease as contract and conveyance and to analyze the lessee-sublessor's remedy for the sublessees' breach under contract principles in order to achieve a just result consonant with the intent of the parties to this modern commercial lease. A commercial lease, like other contracts, is predominantly an exchange of promises. *Wright v. Baumann*, 239 Or. 410, 398 P.2d 119, 120 (1965). The covenant to pay rent represents one such promise, and the fairness of requiring fulfillment of that covenant often depends upon the landlord's performance of other covenants contained in the lease. *Shanahan*, 189 Colo. at 171–72, 539 P.2d at 1262–63. We can perceive no reason why the covenant to pay rent should be treated differently than a covenant to pay contained in any other contract. *See* 1 *American Law of Property*, *supra*, § 3.11 (stating that the covenant to pay rent in a lease is a contractual provision). The parties to a commercial lease are generally sophisticated and aware of the nature of contractual obligations.[4]

Public policy also favors the application of contract principles to these circumstances. Under traditional property law principles a landlord could allow the property to remain unoccupied while still holding the abandoning tenant liable for rent. This encourages both economic and physical waste. In no other context of which we are aware is an injured party permitted to sit by idly and suffer avoidable economic loss and thereafter to visit the full adverse economic consequences upon the party whose breach initiated the chain of events causing the loss. Furthermore, it is generally in the interests of society that property be put to practical use so far as is economically feasible. Usually, no economic value is obtained from property if a landlord allows it to remain idle. At the same time, the possibility of physical damage to the property through accident or vandalism is increased. The rules for awarding damages in the context of abandonment and breach by the tenant should discourage, rather than encourage, economic and physical waste. *MAR–SON, Inc.*, 259 N.W.2d at 291; *Wright*, 398 P.2d at 120–21; C. Kaufman,

---

4. We express no view as to whether our holding today can be applied to leases of all types. On several occasions we have recognized that the parties to a residential lease are not in the same relative position, at least with regard to the equality of bargaining power between them, as are parties to a typical commercial lease. *See, e.g., Martin v. Allen*, 193 Colo. 395, 566 P.2d 1075 (1977) (recognizing that § 38–12–101 through –103, 16A C.R.S. (1982), governing wrongful withholding of security deposits by residential landlords, was enacted to equalize the disparity in power which exists between landlord and tenant in disputes over relatively small sums). It remains for future determination whether differences in the form, subject matter, and the interests of society as among various types of leases warrant that there be differences in treatment with respect to the same or similar problems and issues.

*Corbin on Contracts* § 1039A (1984 Supp.); D. Dobbs, *Handbook on the Law of Remedies* § 12.6, at 828–29 (1973); McCormick, *The Rights of The Landlord Upon Abandonment of The Premises By The Tenant,* 23 Mich.L.Rev. 211 (1925). We believe that the contract principle of "avoidable consequences" or "duty to mitigate" should be applied in this context to prevent a landlord from passively suffering preventable economic loss, to encourage the productive use of land, and to decrease the likelihood of physical damage to property.[5] Likewise, a landlord should be permitted to maintain an action for contract damages caused by a tenant's wrongful abandonment so that the landlord is able to receive the benefit of his bargain.

■ The facts of the present case readily lend themselves to analysis under familiar principles of contract law. The lessee-sublessor and the owner-lessor expressly agreed to a surrender of the primary lease on mutually satisfactory terms. At the time, the sublessees had abandoned the premises, so the intent and effect of the surrender of the primary lease was to accomplish a surrender of the sublease as well. This terminated the privity of estate between lessor and lessee-sublessor and between lessee-sublessor and sublessees. However, the lessee-sublessor intended to hold the sublessees liable for rent as parties to a contract, and privity of contract between the parties to the sublease with respect to the covenant to pay rent was not terminated. *See* Hicks, *supra,* at 521–22; McCormick, *supra,* at 216–17. The sublessees remained under a personal obligation to carry out the terms of the covenant to pay rent contained in the lease.[6]

■ Prior to surrender of the primary lease, the sublessees not only had abandoned the premises but also had returned the keys and had failed to pay installments of rent that had come due. Viewed in terms of contract law, this was in the nature of an anticipatory repudiation amounting to a total breach of the sublease. *See Galvin v. Lovell,* 257 Wis. 82, 42 N.W.2d 456 (1950); 4 A. Corbin, *Corbin on Contracts* §§ 959, 986 (1951). *Cf. Stone v. Caroselli,* 653 P.2d 754 (Colo.App.1982) (distributors anticipatorily repudiated exclusive distributorship contract by telling manufacturers they would not sell their products); § 4–2–610 comment 1, 2 C.R.S. (1973) ("[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance."). We see no reason that the surrender should operate to leave the lessee-sublessor without remedy against the sublessees, for the very purpose of the surrender upon which the sublessees rely was to mitigate damages by eliminating the lessee-sublessor's obligations under the primary lease to pay a higher rental than it could obtain by reletting the premises. Ordinarily, a landlord would be required to exercise reasonable efforts to procure a substitute tenant in order to fulfill his duty to mitigate. *MAR–SON, Inc.,* 259 N.W.2d at 291–92; *First Wisconsin Trust Co. v. L. Wiemann Co.,* 93 Wis.2d 258, 286 N.W.2d 360, 366 (1980); Weissenberger, *supra,* at 22–23. *See Tull v. Gundersons, Inc.,* 709 P.2d 940, 946 (Colo.1985) ("A party injured by a breach of contract has a duty to make a reasonable effort to reduce the damage

**5.** Language in several of our cases would permit a landlord to refuse to accept a tenant's surrender, to make no effort to obtain a substitute tenant, and to continue to hold the tenant liable for rent while allowing the premises to remain idle. *See Heatherridge Management Co. v. Benson,* 192 Colo. 190, 558 P.2d 435 (1976) (by implication); *Bastien v. Bronstine,* 104 Colo. 521, 92 P.2d 736 (1939) (by implication); *Ruple v. Taughenbaugh,* 72 Colo. 171, 210 P. 72 (1922); *Fehringer v. Wagner-Stockbridge Trading Co.,* 61 Colo. 359, 157 P. 1071 (1916) (by implication); *Wilson v. Agnew,* 25 Colo.App. 109, 136 P. 96 (1913); *Curtis v. Hammond,* 43 Colo. 277, 95 P.

921 (1908); *Carson v. Arvantes,* 10 Colo.App. 382, 50 P. 1080 (1897), *aff'd,* 27 Colo. 77, 59 P. 737 (1899). To the extent that these cases so hold and are inconsistent with our holding today that a landlord must mitigate damages upon abandonment of the premises by the tenant, we overrule them.

**6.** We need not address here the scope of the doctrine that covenants in a lease can have continuing viability even after privity of estate between landlord and tenant has ended.

sustained."). This course of action was not available to the lessee-sublessor in this case because of the actions of the sublessee. The necessity of the surrender was in essence forced upon the lessee-sublessor in order to minimize the economic loss, and the lessee-sublessor therefore fulfilled his duty to mitigate damages.

We must now determine the proper measure of damages in this case. This requires nothing more than application of established principles of contract law. The measure of damages is the amount it takes to place the landlord in the position he would have occupied had the breach not occurred, taking into account the landlord's duty to mitigate. *See Taylor v. Colorado State Bank*, 165 Colo. 576, 440 P.2d 772 (1968); Weissenberger, *supra*, at 18 n. 82. Usually this will be the difference between the rent reserved in the lease and the reasonable rental value of the premises for the duration of the term of the lease, plus any other consequential damages caused by the breach. *United States Rubber Co.*, 97 S.E.2d at 409; McCormick, *supra*, at 220–21. *Cf. General Insurance Co. of America v. City of Colorado Springs*, 638 P.2d 752, 759 (Colo.1981) ("Generally, the measure of damages for a breach of contract is the loss in value to the injured party of the other party's performance caused by its failure or deficiency, plus any other incidental or consequential loss caused by the breach, less any cost or other loss that the injured party has avoided by not having to perform."). However, if the landlord is unable to secure a substitute tenant after making reasonable efforts to do so or if the premises have been rendered unmarketable, the landlord is entitled to an amount equal to the full amount of rent reserved in the lease, plus any other consequential damages. *See Grayson v. Mixon*, 176 Ark. 1123, 5 S.W.2d 312 (1928). *Cf. Kulm v. Coast-to-Coast Stores Central Organization, Inc.*, 248 Or. 436, 432 P.2d 1006, 1009 (1967) (breach of agreement to renew lease). If the landlord has avoided any cost by not having to perform, that cost should be deducted from his recovery in order to place him in the position he would have occupied had the tenant performed.

Under the circumstances of the present case, we conclude that the sublessees are obligated to the lessee-sublessor in the amount of $1900 per month for the entire term remaining on the sublease after the last rental payment made by the sublessees, less the $600 per month rental under the primary lease subsequent to surrender of that lease, as the damages actually suffered by the lessee-sublessor for the sublessees' breach of the covenant to pay rent in the sublease by anticipatory repudiation.

We remand this case to the court of appeals for return to the trial court for entry of judgment consistent with the views expressed in this opinion.