23CA2119 Union III v Momentum Marketing 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2119
Jefferson County District Court No. 22CV31256
Honorable Randall C. Arp, Judge

Union III, LLC, a Colorado limited liability company,

Plaintiff-Appellee,

v.

Momentum Marketing Solutions, Inc., a Pennsylvania corporation, and
Matthew John Lafferty

Defendants-Appellants.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE RICHMAN*
Dunn and Navarro, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Hatch Ray Olsen Conant LLC, Brian T. Ray, Denver, Colorado, for Plaintiff-
Appellee

Fennemore Craig, P.C., Mallory P. Nordberg, Denver, Colorado, for Defendants-
Appellants

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendants, Momentum Marketing Solutions, Inc. ("Momentum") and Matthew John Lafferty appeal the district court's entry of judgment and the award of damages in favor of Union III, LLC ("Union III"). We affirm in part and reverse in part, and we remand the case with directions.

## I.     Background

¶ 2     On June 23, 2021, Union III, a commercial landlord, and Momentum, a direct marketing firm owned by Lafferty, entered into a written commercial lease for the property located at 1350 Independence Street, Suite 301, Lakewood, CO 80215. Lafferty executed a personal guaranty making him "jointly and severally, unconditionally and irrevocably" liable for Momentum's execution of the lease with Union III.

¶ 3     The lease term ran from July 1, 2021, through June 20, 2024. However, on August 30, 2021, Lafferty informed Union III that Momentum had gone out of business, and he would be unable to pay the rent due on September 1, 2021. Union III provided Lafferty with options for lease termination, but Lafferty did not respond.

¶ 4     On September 8, 2021, Union III provided defendants with a Notice to Quit, which required that within the next seventy-two

1

hours defendants either pay the past due rent and late fee, or otherwise vacate the premises. Defendants chose to vacate the premises.

¶ 5    On October 6, 2021, Union III sent defendants a document stating that it did not consider the lease to be terminated. However, Union III listed the property for lease at a per square foot rate slightly above what Momentum's lease had provided, and eventually procured a replacement tenant, whose lease term began on July 1, 2023.

¶ 6    In November 2022, Union III initiated this action for breach of the lease against Momentum and breach of the guaranty against Lafferty. Union III moved for summary judgment on the issue of liability, which the district court granted. However, the court determined that testimony was needed to determine the amount of damages and it held a separate bench trial for that determination.

¶ 7    Following the trial, the district court issued a thorough and well-reasoned order and judgment as to the amount of damages.

¶ 8    The court concluded that Union III terminated the lease on September 8, 2021. The court then concluded that Union III took reasonable and appropriate steps to mitigate its damages, including

removing defendants' leftover property, relisting the property for lease at a reasonable rate, and replacing the carpet. After determining that Union III's damages were limited to one of the remedy provisions in the lease, the district court detailed its findings for Union III's rent-related and non-rent related damages.

¶ 9 On appeal, defendants assert that (1) the district court erred by interpreting the lease's term "reasonable rental value" to mean the amount of rent Union III received from the replacement tenant; (2) the district court erred by finding that Union III was entitled to late fees on its damages; (3) the district court erred by awarding Union III damages for its expense to recarpet the premises; and (4) the district court erred by finding that defendants were not entitled to a reduction of the damages they owed Union III for the months of July through September 2023. We address each contention in turn.

## II. "Reasonable Rental Value"

¶ 10 Defendants first contend that the trial court erred by interpreting the term "reasonable rental value" to mean the amount of rent Union III actually obtained from the replacement tenant. We are not persuaded.

## A. Standard of Review and Applicable Law

¶ 11 "A landlord's claim against a tenant for breach of a commercial lease is a breach of contract claim that 'requires nothing more than application of established principles of contract law.'" *Tremitek, LLC v. Resilience Code, LLC*, 2023 COA 54, ¶ 19 (quoting *Schneiker v. Gordon*, 732 P.2d 603, 612 (Colo. 1987)).

¶ 12 The interpretation of a contract is a question of law we review de novo. *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24. However, we defer to the district court's factual findings unless they are clearly erroneous — meaning they have no support by the record. *Cronk v. Bowers*, 2023 COA 68M, ¶ 12.

¶ 13 When interpreting a contract, our primary goal is to give effect to the parties' intent. *French*, ¶ 25. We discern that intent primarily from the language of the contract itself. *Id.* We first determine whether the contract terms are ambiguous, which we do by examining the contract language and construing that language based on the plain and generally accepted meaning of the words. *Id.* If the contract is unambiguous, we will enforce it as written. *Id.* However, if the contract is ambiguous, insofar as the terms are susceptible to more than one reasonable interpretation, then

4

extrinsic evidence is admissible to establish the parties' intent. *Id.* But the mere fact that the parties disagree about a contract's interpretation does not itself establish ambiguity. *Id.*

¶ 14 Typically, the proper measure of damages in such an action is "the amount it takes to place the landlord in the position [it] would have occupied had the breach not occurred, taking into account the landlord's duty to mitigate." *Tremitek,* ¶ 19 (internal quotation omitted). The duty to mitigate means that a landlord cannot "sit by idly and suffer avoidable economic loss." *Id.* at ¶ 20 (citing *Schneiker,* 732 P.2d at 610). Rather, a landlord fulfills its duty to mitigate if it makes "reasonable efforts" to reduce the damages sustained. *Id.* (internal quotation omitted). Ordinarily, this means the landlord must "exercise reasonable efforts to procure a substitute tenant" — including by taking "some affirmative steps" to do so. *Id.* (quoting *Pomeranz v. McDonald's Corp.,* 821 P.2d 843, 847 (Colo. App. 1991), *aff'd in part and rev'd in part on other grounds,* 843 P.2d 1378 (Colo. 1993)).

¶ 15 The tenant bears the burden of proving the landlord failed to mitigate damages. *Id.* at ¶ 22. The failure to mitigate is not a bar to recovery, but it reduces the total damages by the amount of the

loss that could reasonably have been avoided. *Id.* (citing *U.S. Welding, Inc., v. Advanced Circuits, Inc.*, 2018 CO 56, ¶ 20). Whether an injured party has exercised reasonable efforts to mitigate is generally a question of fact that we review for clear error. *Id.* But whether the district court applied the correct legal standard is a question of law that we review de novo. *Id.*

## B.  Application

¶ 16    As a preliminary matter, we note that defendants do not challenge the district court's factual findings on mitigation of damages or the conclusion that Union III adequately mitigated its damages. Accordingly, we turn to review of the district court's damages calculation.

¶ 17    A tenant's abandonment of the premises and failure to pay rent when it comes due is "an anticipatory repudiation amounting to a total breach" of the lease. *Id.* at ¶ 21 (citing *Schneiker*, 732 P.2d at 611). The damages for such a breach will usually be "the difference between the rent reserved in the lease and the reasonable rental value of the premises for the duration of the term of the lease, plus any other consequential damages caused by the breach." *Id.* (internal quotation omitted). But if the landlord is unable to

6

secure a substitute tenant despite its reasonable efforts, the landlord is entitled to "the full amount of rent reserved in the lease," plus consequential damages. *Id.* (internal quotation omitted).

¶ 18 The district court, having concluded that Union III was not able to find a suitable tenant despite reasonable efforts, looked to the lease's provisions addressing the landlord's remedies in the event of default to determine damages. Before we do the same, we note that the lease contains no express or implied provision making the remedies available to the landlord in the event of a default exclusive. And "when a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law." *Schneiker*, 732 P.2d at 609 n.3.

¶ 19 Thus, the district court could have awarded as damages, under common law, "the amount it takes to place the landlord in the position [it] would have occupied had the breach not occurred," namely the "full amount of rent reserved in the lease," less the amount received in mitigation, *i.e.,* the replacement tenant's rent. *Tremitek,* ¶¶ 19, 21 (internal quotations omitted). In effect, this is

the result the district court reached by interpreting and applying the provisions of the lease.

¶ 20    We turn next to the district court's interpretation of the remedies provision of the lease. The lease listed three different remedies available to Union III in the event of default by Momentum. Based on the facts of the case, the district court concluded that Union III's rent-related remedies are limited to section 20(a) of the lease, which provides,

> In the event of an occurrence of default as set forth above, [Union III] shall have the right to . . . [t]erminate this Lease and end the term hereof by giving to [Momentum] written notice of such termination, in which event [Union III] shall be entitled to recover from [Momentum] at the time of such termination the present value of the excess, if any, of the amount of rent reserved in this Lease for the then balance of the term hereof over the then reasonable rental value of the Premises for the same period.

¶ 21    Section 20(a) also defines "reasonable rental value" as,

> the amount of rental which [Union III] can obtain as rent for the remaining balance of the initial term or renewal term, whichever is applicable.

¶ 22    The parties do not dispute the amount of rent reserved under the lease. Rather, the parties dispute the meaning of "reasonable

8

rental value." Union III contends that "reasonable rental value" should be interpreted as "rents actually received." However, defendants assert that "reasonable rental value" should be interpreted as the "market rent rate" or "fair rental value" that Union III could potentially receive.

¶ 23    We, like the district court, conclude that the lease's definition of "reasonable rental value" is controlling, as it represents the intent of the parties. *See Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 11. When the parties to a contract agree on a definition of a contractual term, that definition controls. *See Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 291 (Colo. 2005).

¶ 24    As the parties note, the sticking point is the phrase used in the lease's definition of reasonable rental value: "the amount of rental which landlord *can obtain* as rent." (Emphasis added.)

¶ 25    The district court determined that the phrase means "rent that [Union III] actually obtained as rent for the remaining balance of the Parties' rental term." In reaching its conclusion, the district court acknowledged that the word "can" might indicate "actuality" as well as "possibility." In other words, it recognized that one definition of "can" might also be "could," so that the phrase might mean rent the

9

landlord "could" have received.  In which case, "reasonable rental value" would mean fair market value.  However, as the district court astutely noted, if that was the definition the parties were seeking, there would have been no reason to insert the separate definition of "reasonable rental value."

¶ 26    Thus, the district court concluded:

> Because the Lease Agreement provides for a separate definition of "reasonable rental value" it would be unreasonable to read that term to mean market value.  The only reasonable conclusion stemming therefrom is that "can obtain" means rents actually received and not market value.

¶ 27    Like the district court, we conclude there would have been no reason to further and specifically define "reasonable rental value" in section 20(a) if the only meaning of the term was fair market value. That would have been achieved without the addition of the definitional sentence, rendering the lease's definitional sentence superfluous.  But we will not interpret a lease to render explicitly drafted provisions superfluous or unnecessary.  *See Sulca v. Allstate Ins. Co.,* 77 P.3d 897, 899 (Colo. App. 2003).

¶ 28    To the extent that defendants argue that *Emrich v. Joyce's Submarine Sandwiches, Inc.,* 751 P.2d 651, 652 (Colo. App. 1987),

controls the outcome of this issue because a division of this court applied an "almost identical" damages provision to the one in this case and allowed only for recovery of the fair market value, that case is distinguishable in several ways.

¶ 29     First, the actual issue in that case was whether the damages provision was an unenforceable penalty clause, and the division did not interpret the meaning of "reasonable rental value." *See id.* Second, there is no indication that the lease in *Emrich* included a specific definition of "reasonable rental value" that may have differentiated the term from the meaning of fair market value, as is true here. *See id.* Third, *Emrich* does not address whether the landlord reasonably mitigated the damages from the termination of the lease, or how mitigation relates to the damages award. *See id.*

¶ 30     Finally, under defendants' interpretation, if at the time of termination of the lease, the fair market value was greater than the rental rate provided in the lease, the landlord would receive zero damages without regard to its reasonable efforts to mitigate its damages. Or if, in the alternative, the fair market rental rate is lower than the rental rate provided in the lease, the landlord would receive damages even if it did relet the premises, without regard to

11

the rent paid by the replacement tenant.  Both of these scenarios render defendants' suggested interpretation unreasonable and inconsistent with the principle that the proper measure of a landlord's damages in such a case is "the amount it takes to place the landlord in the position [it] would have occupied had the breach not occurred, taking into account the landlord's duty to mitigate." *Tremitek,* ¶ 19.

¶ 31    Accordingly, we conclude that "reasonable rental value" — defined by the lease as "the amount of rent[] which Union III *can obtain* as rent" — equals the amount of rent Union III obtained from the replacement tenant.  Therefore, the district court's interpretation of "reasonable rental value" was not erroneous.

¶ 32    Defendants submit that the error of the district court's interpretation is demonstrated by the following point: if the court had calculated Union III's damages before it relet the premises, the reasonable rental value according to the court's interpretation would have been different, and the amount that Union III "can and did" receive as "reasonable rental value" would be $0.00, resulting in a much higher amount of damages.  Had the district court done so, that might well be erroneous for that approach would not take

12

into account the rent Union III received from the replacement tenant. But that is not the calculation used by the district court, and we have no reason to address the hypothetical posed by defendants.

¶ 33     We conclude that the court's determination of rental damages for the unpaid portion of the lease was supported by the evidence and consistent with applicable law.

### III.   Late Fees

¶ 34     Defendants also contend that the district court erred by determining that Union III is entitled to late fees on its damages under section 20(a). We agree.

### A.     Standard of Review and Applicable Law

¶ 35     Again, the interpretation of a contract is a question of law we review de novo. *French*, ¶ 24. However, we defer to the district court's factual findings unless they are clearly erroneous. *Cronk*, ¶ 12.

### B.     Application

¶ 36     Section 22 of the lease provides,

> [I]f any installment of rent, additional rent, or any other sums due from Tenant shall not be received by Landlord or Landlord's designee

> within three (3) business days after such amount shall be due, then, without any requirement for notice to Tenant, Tenant shall pay to Landlord a late charge equal to ten percent (10%) of such overdue amount.

¶ 37     Under this section, the district court awarded Union III late fees on both the rent due in September 2021 and on its damages under section 20(a).[1]  The district court disagreed with defendants' argument that late fees were no longer chargeable after Union III terminated the lease.  Rather, the court determined that (1) nothing in the language of section 20(a) nullified the effect of the late fee provision in section 22; and (2) section 22 entitles Union III to late fees for other overdue sums owed to Union III, not just overdue rent.

¶ 38     While we agree with the district court that nothing in section 20(a) negates section 22, we disagree that section 22 stays in effect after the lease is terminated.  Because we read and give meaning to the provisions of the lease as a whole, rather than in isolation, *see First Fin. Ins. Co. v. Albertson's, Inc.*, 91 P.3d 470, 472 (Colo. App.

---

[1] The parties do not dispute, and we agree, that Union III is entitled to a late fee on Momentum's missed rent payment for September 2021.

14

2004), section 20(a) is Union III's applicable remedy and cannot be subject to the late fee provision after the lease was terminated on September 8, 2021.

¶ 39 Moreover, it is counterintuitive to enforce a late fee provision after the termination of the lease, particularly when the late fee provision does not provide for its applicability after termination. *Sulca*, 77 P.3d at 899 ("Any construction that would render any clause or provision unnecessary, contradictory, or insignificant should be avoided.").

¶ 40 Accordingly, Union III is not entitled to late fees on its section 20(a) damages, other than for the September 2021 non-payment.

## IV.  Recarpeting Expense

¶ 41 Defendants contend that the district court's award of damages to Union III for recarpeting expenses amounts to a windfall. We aren't persuaded.

### A.  Standard of Review and Applicable Law

¶ 42 A general principle of contract law is that the proper measure of damages is "the amount it takes to place the landlord in the position [it] would have occupied had the breach not occurred,

15

taking into account the landlord's duty to mitigate." *Tremitek*, ¶ 19 (internal quotation omitted).

¶ 43    As pertinent here, a plaintiff may not receive double recovery for the same losses arising from the same injury. *Taylor Morrison of Colo., Inc. v. Terracon Consultants, Inc.*, 2017 COA 64, ¶ 27. "Thus, in order to prevent double recovery, a court must set off a loss by the amount of compensation a party already received from another liable party for the same injury." *Id.* (citing *Andrews v. Picard*, 199 P.3d 6, 11 (Colo. App. 2007)).

¶ 44    The district court "has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous." *Ute Water Conservancy Dist. v. Fontanari*, 2022 COA 125M, ¶ 52 (quoting *In re Estate of Chavez*, 2022 COA 89M, ¶ 52) (internal quotations omitted). However, the question of whether the district court misapplied the law when determining the measure of damages is a question of law that we review de novo. *Id.*

## B.    Application

¶ 45    Defendants do not dispute that the carpet on the premises was damaged and needed to be replaced. Rather, they challenge

whether the replacement tenant's increased rental rate covered the expense of carpet replacement such that Union III is not also entitled to that amount from defendants.

¶ 46 The district court and Union III seemingly pose this issue as whether the replacement tenant opted for the five-year lease term with a higher rent specifically due to the new carpet. However, the issue is really whether the increased rental rate covered the expense of recarpeting the premises. Regardless, we perceive no clear error.

¶ 47 At trial, defendants introduced emails exchanged between Union III's representative and the replacement tenant, in which Union III offered various lease terms including a three-year or five-year lease with the premises in "as is" condition, or a three-year or five-year lease "with new carpet" at a higher monthly rental rate. The replacement tenant opted for the five-year lease term with new carpeting. To that point, the replacement tenant's lease provided that Union III would remove and reinstall carpet on the premises, and the email exchange also showed that the replacement tenant chose between six different carpet samples offered by Union III's representative. However, Union III's representative also testified that he and the replacement tenant "had a conversation about some

17

additional things . . . that [were] not included in the lease." While evidence as to the cost of the carpet replacement was admitted at trial, there was no evidence to show that the replacement tenant's increased rental rate was based explicitly on the cost of the replacement carpet.

¶ 48 Because there is some record support for it, we cannot conclude that the district court's finding that the replacement tenant's increased rent did not cover the recarpeting expense was clearly erroneous. Therefore, the district court properly concluded that Union III is entitled to recover that expense from defendants.

## V. Damages from July to September 2023

¶ 49 Defendants also contend that the district court erred by not reducing their damages during the time period when Union III granted the replacement tenant free rent. We disagree.

### A. Standard of Review and Applicable Law

¶ 50 A landlord has a duty to mitigate its damages, meaning it must make "reasonable efforts" to reduce the economic loss it sustains. *Tremitek*, ¶ 20. "Ordinarily, this means the landlord must 'exercise reasonable efforts to procure a substitute tenant' —

including by taking 'some affirmative steps' to do so." *Id.* (internal quotation omitted).

¶ 51 Whether an injured party has exercised reasonable efforts to mitigate is generally a question of fact that we review for clear error. *Id.* But whether the district court applied the correct legal standard is a question of law that we review de novo. *Id.* at ¶ 23.

¶ 52 Likewise, we will only set aside a district court's damages award if "it is manifestly and clearly erroneous." *Ute Water Conservancy Dist.*, ¶ 52 (internal quotation omitted). However, whether the district court misapplied the law when determining the measure of damages is a question of law that we review de novo. *Id.*

### B. Application

¶ 53 Again, we note that the parties do not contest on appeal the district court's finding that Union III made reasonable efforts to mitigate its damages. Defendants do contest, however, whether Union III's offer of three months of free rent to the replacement tenant was a means of mitigating its damages.

¶ 54 The district court found that

> The new lease between [Union III] and [the replacement tenant] began on July 1, 2023, but did not require [the replacement tenant] to

begin paying rent until October 1, 2023. The Court finds that this was a reasonable strategy by [Union III] to relet the property and mitigate damages. Because [the replacement tenant] did not begin paying rent until October 2023, the Court finds that [Union III] can recover damages under section 20(a) for July 2023, August 2023, and September 2023.

¶ 55 This finding is supported by the record. At trial, Union III's representative testified to his efforts to market and relet the premises. He said, "[Offering free rent] is part of negotiation. Sometimes it's one month free rent, sometimes maybe it's three months free rent. It just kind of depends on the market as well."

¶ 56 Accordingly, we perceive no error in the district court's finding that offering three months of free rent to the replacement tenant was a reasonable strategy by Union III to relet the premises and mitigate its damages. Therefore, the district court did not err by not reducing the damages during the three-month period that the replacement tenant received free rent.

## VI. Appellate Attorney Fees

¶ 57 Both Lafferty and Union III request an award of their reasonable appellate attorney fees under C.A.R. 39.1 and the guaranty, which contains a prevailing party provision. Because

20

both parties received a favorable ruling on some aspect of this appeal, the district court "is in the best position to determine which party prevailed under the terms of the contract." *Ralph L. Wadsworth Constr. Co., LLC v. Reg'l Rail Partners*, 2024 COA 78, ¶ 67.

¶ 58 To the extent Union III asserts that Lafferty is not entitled to appellate attorney fees because he did not previously request attorney fees before the district court, no such requirement exists. C.A.R. 39.1 merely requires that the party requesting appellate attorney fees make a "specific request, and explain the legal and factual basis" for the award.

## VII. Disposition

¶ 59 We reverse the judgment to the extent that it awarded Union III recovery of late fees on its damages. We affirm the judgment in all other respects. The case is remanded for entry of a revised judgment and further proceedings consistent with this opinion regarding the parties' claims for appellate attorney fees and costs.

JUDGE DUNN and JUDGE NAVARRO concur.