**Theodore R. POMERANZ; Pomeranz Investment Company; Marvin L. Stone and Gerald S. Gray, Trustees; Jack and Mildred Zerobnick; David Pollock; Stephen Gorden; Estate of Ruth Stone; Agnete Cohen; Helen B. Barron; Beatrice Pomeranz; Lisa E. Feld; Tony R. Pomeranz; Alan Z. Pomeranz, the Owners, d/b/a Mesa Denver Associates, Plaintiffs–Appellees and Cross–Appellants,**

v.

**McDONALD'S CORPORATION, A Delaware corporation, Defendant–Appellant and Cross–Appellee.**

No. 89CA2086.

Colorado Court of Appeals, Div. V.

May 23, 1991.

Rehearing Denied July 11, 1991.

Certiorari Granted Jan. 6, 1992.

Roger L. Simon, Denver, for plaintiffs-appellees and cross-appellants.

Holland & Hart, John C. Tredennick, Jr., Daniel W. Patterson, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge JONES.

Defendant, McDonald's Corporation, appeals from a judgment entered by the trial court holding that it improperly terminated its lease with plaintiffs, the co-owners of the subject premises. Plaintiffs cross-appeal the portion of the trial court's judgment reducing plaintiffs' award by the present value of the reasonable rental value of the premises. We affirm the portion

of the judgment holding that McDonald's improperly terminated the lease but reverse as to the amount of damages awarded.

Plaintiffs own a shopping center in Grand Junction, Colorado. On January 16, 1963, plaintiffs' predecessor in interest and McDonald's entered into a lease for a retail location in the shopping center.

In May 1974, the parties amended the lease to require that McDonald's pay rent, taxes, insurance, and all maintenance costs.

As early as 1973, McDonald's had been advised by the Colorado Department of Health that uranium mill tailings were present on the leased premises. However, both in 1973 and in 1980, the health department advised McDonald's that there was "no reason for undue concern ... about the radiation levels."

In February 1984, the Department of Energy (DOE) notified McDonald's that the property was sufficiently contaminated that it would eventually require remedial action.

After an unsuccessful attempt to negotiate an extension of the lease term, McDonald's, in February 1986, ceased operation at the leased premises, moved to a different location, and retained a real estate broker to help locate a subtenant. It is undisputed that McDonald's vacated the premises because it was unable to renegotiate a longer term lease and not because of the mill tailings on the property.

On May 23, 1986, DOE contacted plaintiffs and advised them that extensive excavation would be necessary to remove the tailings. Plaintiffs were further advised that the work could be accomplished at the government's expense if plaintiffs would agree to participate in the remedial action plan.

On June 5, 1986, plaintiffs signed an agreement to have the removal work performed. Later that month, they forwarded a copy of the removal plan to McDonald's which had vacated the premises at that time, but was still subject to the lease. McDonald's consented to the removal pro-gram but, in so doing, expressly reserved all of its rights under the lease.

Subsequently, a real estate agent retained by McDonald's for the purpose of finding a subtenant for the property, informed McDonald's that, in his opinion, the property could not be subleased until the removal work had been completed.

In September 1986, McDonald's notified plaintiffs that it would cease making payments pursuant to the lease provision titled "Damage to or Destruction of Improvements" which provides as follows:

"If the building on said premises shall be rendered untenantable by fire or other casualty, the Lessor will, within ninety (90) days from the date of said damage or destruction, repair or replace said building so that Lessee may continue in occupancy. It is further agreed, however, that the rent herein required to be paid shall abate during said period of untenantability. It is further agreed that if said building cannot be replaced or repaired in ninety (90) days due to the inability of the Lessor to obtain materials and labor needed therefor, any strikes, or acts of God, or governmental restrictions that would prohibit, limit or delay said construction, then the time for completion of such repair or replacement shall be extended accordingly, provided, however, that, in any event, if the repair or replacement of the building has not been completed within a period of six months from the date of said damage or destruction, Lessee may at its option terminate this lease."

Plaintiffs gave McDonald's written notice of default by letter dated October 10, 1986. McDonald's responded with a letter on October 28, 1986, stating that it considered the lease terminated pursuant to the above provision.

Excavation work began on November 28, 1986, and was completed on April 10, 1987, a period of four months and thirteen days.

Plaintiffs filed a complaint against McDonald's alleging that it had breached the lease in failing to pay rent and expenses and in failing to maintain the premises, after September 1986.

At the conclusion of a trial to the court in October 1988, the court determined that McDonald's "did not validly terminate the lease [because] the premises were not untenantable for more than six months" and because "the definition of casualty ... [could not] be construed to include the uranium mill tailings found on the property." The court also concluded, however, that plaintiffs had failed to mitigate damages from November 1986 to August 1988.

On December 22, 1988, the trial court issued amended findings in which it determined that plaintiffs had taken reasonable steps to mitigate damages. On October 31, 1989, judgment was entered against McDonald's in the amount of $130,856, an amount which, in spite of the court's latest findings, still reflected a reduction for plaintiffs' failure to mitigate damages.

## I.

McDonald's first contends that the trial court erred in finding that it improperly terminated the lease. We disagree.

"Untenantability" has been defined as a condition characterized by:

"damage of such a nature that the premises cannot be used for the purpose for which they were rented and cannot be restored to a fit condition by ordinary repairs made without unreasonable interruption of the tenant's use." 1 M. Friedman, *Friedman on Leases* 500 (3d ed. 1990).

The question of whether premises have been rendered "untenantable" is an issue of fact for the trier of fact, here, the trial court. *Presbyterian Distribution Service v. Chicago National Bank*, 28 Ill.App.2d 147, 171 N.E.2d 86 (1960). And continued occupancy coupled with the carrying on of business may provide proof of tenantability. *See Franzo & Resciniti, Inc. v. Duva*, 4 Misc.2d 984, 159 N.Y.S.2d 425 (1956).

■ Here, after McDonald's was first notified that the mill tailings were contaminated, it continued to operate its restaurant on the premises for some twenty-three months. Moreover, when McDonald's ultimately decided to vacate the premises, that decision was based upon its inability to renegotiate a longer lease term and was not due to the presence of the mill tailings.

Thus, we conclude that the record contains substantial evidence to support the trial court's finding that the premises were not untenantable prior to the removal work.

McDonald's, however, asserts that under the lease, it was entitled to sublease the premises and that such entitlement was a purpose for which the lease was entered into. McDonald's, therefore, contends that, because the impending removal work made it extremely difficult to secure a subtenant, the premises could not be used for one of its intended purposes under the lease. We disagree with this contention for two reasons.

First, the pertinent provision of the lease specifically contemplates that a condition of untenantability must include some amount of "damage or destruction" to the premises.

■ While the removal work itself certainly caused damage to the premises, the period over which the work was done lasted only four months and thirteen days and was, therefore, insufficient to trigger the termination provision of the lease. Moreover, and despite McDonald's contention to the contrary, neither the known presence of contaminated mill tailings prior to the removal work, nor the adverse impact of such mill tailings on McDonald's efforts to sublease the premises, amount to "damage or destruction" as those terms are used in the lease.

Secondly, a careful reading of the lease, which was apparently written by McDonald's, reveals that the understood purpose of the lease was for the provision of premises, which met specific plans and specifications provided by McDonald's, for use as a "carry-out restaurant ... for and during the full term of the lease." In this regard, the lessor represents that improvements on the premises will be in full compliance with all building and zoning laws and that "the use of the premises as a carry-out restaurant will be a permitted

use under the zoning classification applicable to the ... premises." Finally, the lessor acknowledges that McDonald's is in the business of providing carry-out restaurants and premises in which such carry-out restaurants are operated "on a nationwide basis."

Hence, while McDonald's did reserve the right to sublease the premises, the language expressing that right, when considered in the context of the entire lease, and when analyzed against the language referred to above, leads us to conclude that the parties did not regard the right to sublease as a "purpose" for which they entered into the lease agreement.

Thus, we conclude that the trial court properly determined that McDonald's did not validly terminate the lease.

## II.

McDonald's next contends that the trial court erred in finding that plaintiffs took reasonable steps to mitigate damages. We agree.

In its original findings of fact and conclusions, the trial court found that plaintiffs had failed to take reasonable steps to secure another tenant after McDonald's terminated the lease.

However, in its amended findings, the court determined that plaintiffs "took such reasonable steps as [they] could under the circumstances to mitigate their damages based upon the totality of the circumstances existing in Grand Junction concerning the economy and demand for commercial property."

■ Generally, a landlord facing a breach by a tenant is required to exercise reasonable efforts to procure a substitute tenant in order to fulfill the duty to mitigate damages. *Schneiker v. Gordon*, 732 P.2d 603 (Colo.1987). The burden of proving failure to mitigate lies with the tenant. *Del E. Webb Realty & Management Co. v. Wessbecker*, 628 P.2d 114 (Colo.App.1981).

Here, Theodore Pomeranz, the managing co-owner of the property, testified that, from August 1986 until February 1988, plaintiffs did not list the property with a real estate agent nor with a multi-listing directory. He also testified that plaintiffs did not place an advertisement in a newspaper or in any other publication and that they did not place a sign on the property during that period. Indeed, Pomeranz conceded that plaintiffs initiated no actions to put a replacement tenant in the vacated premises. Instead, he testified that they merely accepted calls from parties expressing an interest in the property.

This court is not bound by the trial court's findings and conclusions when the evidence is undisputed and the only dispute is as to the legal significance of the facts. *Maltby v. J.F. Images, Inc.*, 632 P.2d 646 (Colo.App.1981).

■ Here, McDonald's met its burden to demonstrate that plaintiffs failed to mitigate. Despite the concededly poor rental market for commercial real estate which existed in Grand Junction during this period, we conclude that plaintiffs were, nevertheless, required to take some affirmative steps to secure a new tenant and that the failure to take such steps constituted a failure to exercise "reasonable efforts" to mitigate damages. *See Thorne v. Broccoli*, 39 Conn.Sup. 289, 478 A.2d 271 (1984) (failure to place advertisements, put up signs or give exclusive listing to realty agent); *Vawter v. McKissick*, 159 N.W.2d 538 (Iowa 1968) (failure to place ad, contact realty agent, or otherwise fully explore rental opportunities). *See* Annot., *Landlord's Duty, on Tenant's Failure to Occupy, or Abandonment of Premises, to Mitigate Damages by Accepting or Procuring Another Tenant*, 21 A.L.R.3d 534 (1968).

■ In their cross-appeal, plaintiffs note that, despite the trial court's finding that they took reasonable steps to mitigate damages, it, nevertheless, reduced the damage award by an amount equal to the reasonable rental value of the premises. Plaintiffs contend that the trial court's finding and award of damages are inconsistent and that damages should not have been so reduced.

We agree that the trial court's findings are inconsistent with its award of damages.

However, because we have determined that plaintiffs failed to mitigate damages, we conclude that a reduction representing the reasonable rental value of the premises is proper.

## III.

Finally, McDonald's contends that the trial court erred in admitting, over its strenuous objections, certain testimony regarding damages for future expenses due for the balance of the lease term, including insurance costs, maintenance costs, and taxes. McDonald's further contends that, because the subject testimony was the only evidence offered as to these figures, plaintiffs failed to meet their burden of proving these items of damages. We agree with McDonald's contentions.

■ The plaintiff in a breach of contract action bears the burden of proof with respect to damages, including consequential damages. *Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo.1985).

■ To recover actual damages for a breach of contract, the plaintiff must present sufficient evidence to prove the amount of damages incurred. *Tighe v. Kenyon*, 681 P.2d 547 (Colo.App.1984). And, if the plaintiff fails to bring forth sufficient competent evidence upon which a trier of fact could base its decision with reasonable certainty as to the amount of damages sustained, the plaintiff is not allowed to recover. *See John v. United Advertising, Inc.*, 165 Colo. 193, 439 P.2d 53 (1968); *Fitzgerald v. Edelen*, 623 P.2d 418 (Colo.App.1980).

Here, the trial court awarded plaintiffs the following amounts due for future expenses under the terms of the lease: $17,703 for insurance, $26,152 for maintenance, and $57,822 for taxes. This award was taken verbatim from the testimony of Pomeranz and no other testimony was offered on these items.

We conclude, however, that Pomeranz's testimony, much of which constituted hearsay and speculation, is insufficient to support an award of damages for future insurance, maintenance, and taxes.

■ Pomeranz's testimony regarding the anticipated costs of insurance through the term of the lease was based solely upon a quote he received from an insurance agent who was not present in the court and, therefore, not available for cross-examination. Moreover, the statement was being offered for the truth of the matter asserted, namely the actual future cost of insurance on the premises.

Such testimony constitutes hearsay and should have been excluded. *See* CRE 801(c), 802; *Goodboe v. Gabriella*, 663 P.2d 1051 (Colo.App.1983). Furthermore, testimony such as this, based solely on a single unaccepted offer, is entirely too speculative to establish with reasonable certainty the actual future cost of insurance. *See Ruth v. Department of Highways*, 145 Colo. 546, 359 P.2d 1033 (1961).

■ Pomeranz's testimony as to future maintenance costs was also speculative and thus incompetent to support an award of damages. Plaintiffs established no foundation to show that Pomeranz had any special knowledge to predict future maintenance costs. Nor did the estimate of such costs contain any information as to the method or basis upon which it was calculated, such as estimated costs of materials and labor, frequency of repairs, or past expenses.

Finally, the testimony of Pomeranz regarding future taxes also was based largely upon speculation. Indeed, the sole foundation offered for this testimony was a 1987 tax bill. In arriving at his estimate, Pomeranz merely took the 1987 figure and added five percent per year as an inflationary factor.

We conclude that this five percent inflationary figure, which was utilized to estimate future taxes as well as maintenance and insurance costs, was entirely incompetent as a basis for actual damages under the contract. Pomeranz was not qualified as an expert in the area of economic forecasting, nor was any foundation laid to show that he had some basis to predict future inflation, a subject which traditionally requires expert qualification. *See Good*

*v. A.B. Chance Co.,* 39 Colo.App. 70, 565 P.2d 217 (1977).

Thus, we conclude that, because plaintiffs failed to present sufficient competent evidence regarding future insurance costs, maintenance costs, and taxes, they may not recover those items of damages.

The judgment is affirmed as to McDonald's liability under the lease. However, as it relates to damages, the judgment is reversed and the cause is remanded to the trial court with instructions to reduce the award of damages by the amount that it presently includes for future taxes, insurance, and maintenance costs. Should the trial court determine that equitable or other principles dictate a rent abatement for the period of the removal work, such may be considered.

NEY and DAVIDSON, JJ., concur.