24CA0520 Tremitek v Resilience 06-05-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0520
Arapahoe County District Court No. 21CV30646
Honorable Elizabeth Beebe Volz, Judge

Tremitek, LLC, a Pennsylvania limited liability company,

Plaintiff-Appellant,

v.

Resilience Code, LLC, a Colorado limited liability company, and Chad
Prusmack,

Defendants-Appellees.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART, ORDER
REVERSED, AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE HARRIS
Yun and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

Fox Rothschild LLP, Christopher T. Groen, Risa B. Brown, Denver, Colorado,
for Plaintiff-Appellant

Greenberg Traurig, LLP, John A. Wharton, Camille Papini-Chapla, Denver,
Colorado, Elliot Anderson, Las Vegas, Nevada, for Defendants-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    In this action for breach of a commercial lease, plaintiff, Tremitek, LLC (landlord), appeals the judgment awarding it damages and attorney fees against defendants, Resilience Code, LLC and Chad Prusmack (tenant).  The landlord argues that the court erred in (1) finding that it failed to mitigate its damages; (2) calculating damages; and (3) determining the attorney fees award.  We agree that the court erred in calculating damages and that the court must reconsider its attorney fees award.  Accordingly, we affirm the judgment in part and reverse it in part, reverse the attorney fees order, and remand the case for further proceedings.

## I.    Background

¶ 2    In January 2017, the landlord and tenant executed a 128-month lease for commercial property in Arapahoe County.  Under the "triple net" lease, the tenant was responsible for paying base rent, which increased over time, along with condominium association assessments and other operating expenses (condo fees) and property taxes.

¶ 3    By October 2020, the tenant had stopped paying rent, which by then was about $8,500 per month.  It vacated the property several months later, in February 2021.

1

¶ 4     The landlord listed the property for sale and then, after the tenant vacated, also for lease.  Over the next year, the landlord's real estate broker received around 100 inquiries, approximately 30 of which "went to second base," meaning the prospective buyers or lessees "were fits" for the property.  In one such inquiry, a ballet company proposed leasing the property beginning in September 2021 for $7,000 in monthly rent (with six months of free rent) plus a $30,000 credit for building improvements (the ballet offer).  The landlord did not respond to the ballet offer or any of the other "second base" inquiries.

¶ 5     In the meantime, in April 2021, the landlord sued the tenant for breach of contract.  Initially, it sought to collect liquidated damages in the amount of all unpaid rent and condo fees, but the trial court ruled that the lease's liquidated damages provision was unenforceable.

¶ 6     The case proceeded to a bench trial in April 2022, where the trial court found that the tenant breached the lease, but it awarded damages only through February 2021, when the tenant vacated the property.  The court concluded that the landlord could have

2

mitigated its damages by selling or re-leasing the property by that date.

¶ 7     The landlord appealed, and a division of this court reversed. The division agreed that the liquidated damages provision was unenforceable, but it concluded that the landlord was not required to sell its property to mitigate damages. *Tremitek, LLC v. Resilience Code, LLC*, 2023 COA 54, ¶¶ 33, 36-37 (*Tremitek I*). Because the trial court's damages award rested on the landlord's failure to sell the property, the division remanded the case for additional findings concerning the landlord's efforts to re-lease the property. *Id.* at ¶ 49.

¶ 8     On remand, the trial court again found that the landlord had failed to mitigate its damages, concluding that with reasonable efforts, the landlord could have re-leased the property by August 2021. Thus, the court awarded the landlord past due rent under the lease (including condo fees and late fees) from the date of the tenant's default to July 2021. Then, using the ballet offer as a benchmark, the court awarded damages for the period from August 2021 to the date of trial in the amount of $1,000 per month — representing the difference between the rent the tenant owed under

the lease and the rent the landlord could have collected from a substitute tenant. By separate order, the trial court awarded the landlord attorney fees in the amount of $129,440.

## II.    Discussion

¶ 9      The landlord contends that the trial court erred in (1) finding that it failed to mitigate its damages; (2) calculating the term and amount of damages; and (3) reducing its requested attorney fees award.

## A.    Standard of Review

¶ 10     A judgment following a bench trial presents a mixed question of fact and law. *Kroesen v. Shenandoah Homeowners Ass'n*, 2020 COA 31, ¶ 55. We review the trial court's factual findings for clear error and its legal conclusions de novo. *Id.* A factual finding is clearly erroneous only if it has no factual support in the record. *Sanchez-Martinez v. People*, 250 P.3d 1248, 1254 (Colo. 2011).

¶ 11     Whether an injured party used reasonable efforts to mitigate its damages is a question of fact, *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997), but whether the trial court applied the correct legal standard in making that determination is a question of law,

*Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1026 (Colo. App. 2005).

¶ 12    Likewise, the proper amount of damages is a fact issue reviewed for clear error while the proper measure of damages is a legal issue reviewed de novo. *See Kroesen*, ¶ 56.

¶ 13    We review a trial court's award of attorney fees for an abuse of discretion. *Cronk v. Bowers*, 2023 COA 68M, ¶ 33.

### B.    Mitigation of Damages

¶ 14    The party claiming damages from a breach of a lease has "the duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained." *Fair*, 943 P.2d at 437 (quoting *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 680 (Colo. 1994)). The duty to mitigate prevents "a landlord from passively suffering preventable economic loss." *Schneiker v. Gordon*, 732 P.2d 603, 611 (Colo. 1987). Instead, the landlord must take "affirmative steps" to re-lease the property, and the failure to take such steps "constitute[s] a failure to exercise 'reasonable efforts' to mitigate damages." *Pomeranz v. McDonald's Corp.*, 821 P.2d 843, 847 (Colo. App. 1991), *aff'd in part and rev'd in part on other grounds*, 843 P.2d 1378 (Colo. 1993).

¶ 15    The landlord acknowledges its duty to mitigate, but it argues that the trial court erred by disregarding a lease provision granting the landlord "sole discretion" to set the terms of any substitute lease. We discern no error.

¶ 16    True, the division in *Tremitek I* noted that the reasonableness of mitigation efforts "must be viewed in light of [the] provision[]." *Tremitek I*, ¶ 50 (quoting *Del E. Webb Realty & Mgmt. Co. of Colo. v. Wessbecker*, 628 P.2d 114, 116 (Colo. App. 1980)). But the division made clear that the lease provision "does not supplant the duty to mitigate." *Id.*; *see also Bert Bidwell Inv. Corp. v. LaSalle & Schiffer, P.C.*, 797 P.2d 811, 812 (Colo. App. 1990) (notwithstanding a lease provision requiring the landlord's consent to sublet, the landlord could not arbitrarily reject a substitute tenant once the duty to mitigate arose). As the division explained, while the law does not require a landlord to accept "*any* offer," it "may not reject a reasonable offer." *Tremitek I*, ¶¶ 51-52.

¶ 17    The trial court correctly applied this standard. In its amended judgment entered after remand, the court recognized that the landlord was "not required to accept every party that [wa]s interested in leasing space, and c[ould] certainly reject an uncertain

tenant."  But it found that the landlord had failed to take reasonable steps to procure a substitute tenant, including by ignoring the ballet offer.

¶ 18    The landlord maintains that it had no duty to pursue the ballet offer, as it was merely a preliminary proposal with "inferior" terms compared to the existing lease.  That argument fails on both fronts.  Even assuming the ballet offer was not an actual offer that could be accepted (though the landlord testified to the contrary at trial), a party seeking to mitigate its damages "cannot give the silent treatment to prospective tenants."  *Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 381 (D.C. 2024); *see also S.N. Mart, Ltd. v. Maurices Inc.*, 451 N.W.2d 259, 262 (Neb. 1990) (landlord failed to mitigate damages when it did not contact a prospective replacement tenant); *Vawter v. McKissick,* 159 N.W.2d 538, 542 (Iowa 1968) (landlord failed to mitigate damages when she made no efforts to "explore the opportunities" to rent to two prospective tenants, including one tenant who did not want to pay the advertised rent).  Nor can the landlord reject an otherwise suitable substitute tenant merely to avoid *any* financial loss.  *See Tremitek I,* ¶ 52 ("[A] landlord may not reject a reasonable offer simply because it does not allow the

7

landlord to recoup *all* of its losses."); *O'Brien v. Black*, 648 A.2d 1374, 1377-78 (Vt. 1994) (landlord failed to mitigate damages when it rebuffed inquiry from a prospective replacement tenant and held out for a more lucrative arrangement); *see also Sizer v. Lopez Velasquez*, 270 A.3d 299, 303 (D.C. 2022) (landlords failed to mitigate damages when they rejected replacement tenants who could not pay the full rent because landlords could have recovered the differential from the breaching tenants).

¶ 19    In any event, the trial court's finding that the landlord failed to mitigate its damages did not turn exclusively on the landlord's decision to ignore the ballet offer.  Rather, the court found that as a general matter, the landlord took a lackadaisical approach to procuring a substitute tenant.  The court's conclusion in this regard is amply supported by the record.

- For more than a year after the tenant's default, the landlord insisted that the lease's liquidated damages provision supplanted any duty to mitigate its losses.  At the April 2022 trial, the landlord's representative continued to misapprehend this duty, explaining that the landlord was not willing to enter

into a lease on less favorable terms in order to mitigate its losses.

- Even before the tenant defaulted, the landlord had listed the property for sale. But it did not retain the broker to re-lease the property until several months after the tenant stopped paying rent. According to the landlord, it could not begin efforts to re-lease the property until the tenants left.

- The real estate broker prepared a spreadsheet showing the approximately thirty inquiries that progressed to "second base." There were "no counterproposals communicated by [the landlord]" to anyone on the spreadsheet.

- The landlord agreed to re-lease the property for $12.50 per square foot, approximately the same rent the tenant had paid for the first twenty months of the lease. The rent was not adjusted to account for the COVID-19 pandemic.

- According to the broker, comparable properties were sold within 120 to 180 days. As of the time of trial, the landlord's property had been listed for sale for around 800 days and for lease for over 400 days. The broker testified that under "fundamental 101 real estate" principles, lowering the rent

9

would "generate some more interest" in the property. But the landlord had not authorized a price reduction at any point since the property was first offered for re-lease.

¶ 20    In sum, considering the entire record, we cannot say that the trial court committed clear error in determining that the landlord failed to mitigate its damages.

## C.    Damages Award

¶ 21    In an action to recover damages for breach of a commercial lease, "[t]he measure of damages is the amount it takes to place the landlord in the position he would have occupied had the breach not occurred, taking into account the . . . duty to mitigate." *Schneiker*, 732 P.2d at 612. This will usually "be the difference between the rent reserved in the lease and the reasonable rental value of the premises" for the relevant period, plus any other consequential damages caused by the breach. *Id.*

¶ 22    In its amended judgment, the trial court awarded the landlord damages in the amount of $119,365.80. This award included three categories:

- *Rent owed while tenant possessed the premises*: $55,068.90 in past due rent and late fees from October 2020 (when the

10

tenant stopped paying rent) through February 2021 (when the tenant vacated the premises).

- *Rent owed while landlord sought a substitute tenant*: $55,296.90 in past due rent and late fees from March 2021 through July 2021, or "the period of time the Court [found] was a reasonable amount of time . . . in which to obtain a substitute tenant."

- *Setoff from a substitute tenant*: $9,000, or $1,000 per month from August 2021 through April 2022 (representing the purported differential in monthly rent between "a substitute tenant" and the amount owed under the breaching tenant's lease).

¶ 23    The landlord raises several challenges to the court's damages computation. First, it points out that the trial court failed to award damages for taxes, which the tenant owed under the lease. Second, concerning the setoff damages, the landlord says the trial court erred by awarding damages only through the date of trial. And third, it says that even assuming the court could use the ballet offer as a benchmark for calculating damages, the award misrepresents

the difference between what the tenant owed and what the ballet company would have paid.

## 1. Taxes

¶ 24    The landlord argues, the tenant concedes, and we agree that the trial court erred by failing to award damages for unpaid taxes owed under the lease from October 2020 through April 2022. *See Tremitek I*, ¶ 49 n.3 (instructing the trial court to award taxes on remand).

## 2. End Date of Damages

¶ 25    The landlord argues that it was entitled to damages through August 2027, the end of the lease term. We agree with the tenant that the landlord waived any claim to damages beyond the date of trial.

¶ 26    Waiver is "the intentional relinquishment of a known right." *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984). It can be implied when, for example, "a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertion." *Id.* When a party waives an issue, we may not review it. *People in Interest of A.V.*, 2018 COA 138M, ¶ 13.

¶ 27    An invited error, likewise, is usually not reviewable. *Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*, 117 P.3d 60, 65 (Colo. App. 2004).  The concept of invited error "rests on the principle that 'a party may not complain on appeal of an error that he has invited or injected into the case; he must abide the consequences of his acts.'" *McGill v. DIA Airport Parking, LLC*, 2016 COA 165, ¶ 9 (quoting *People v. Rediger*, 2015 COA 26, ¶ 52).

¶ 28    Initially, the landlord, arguing it had no duty to mitigate, sought liquidated damages rather than damages for unpaid rent. When the trial court denied this request, the landlord shifted course: it argued that because it *had* attempted to reasonably mitigate, it was entitled to unpaid rent and fees through the date of trial.  To that end, the landlord's trial management order claimed itemized damages through April 7, 2022, in the amount of $340,679.59.  To support this claim at trial, landlord submitted a copy of the lease, along with a spreadsheet detailing these damages on a monthly basis, again limiting them to $340,679.59.  In its written closing argument, the landlord "respectfully request[ed] that the Court enter judgment for breach of the lease in the principal amount of $340,679.59 through April 7, 2022."

¶ 29     Under these circumstances, we conclude that, at best, the landlord waived its argument for post-April 2022 damages by neither requesting those damages nor presenting evidence of post-April 2022 damages at trial.  Alternatively, the landlord invited the error by specifically asking the court to award damages only through April 2022.  Either way, any claim of error is not reviewable on appeal.[1]

3.     Setoff Calculation

¶ 30     To calculate damages for the period after the landlord could have procured a substitute tenant, the court needed to determine the reasonable rental value of the premises at that time and subtract that amount from the amount owed under the lease.  *See Schneiker*, 732 P.2d at 612.  The only evidence presented by the parties regarding reasonable rental value came from the ballet offer.  The landlord does not dispute that the trial court could therefore properly rely on the ballet company's proposal to determine rental

---

[1] To the extent the landlord contends that C.R.C.P. 54(c) compels a different result, we decline to consider that contention.  The landlord's one-sentence argument, which appears in a footnote in its reply brief, is "insufficient to warrant review of that claim." *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623 (Colo. App. 2004).

value.  *Cf. Consumers United Ins. Co. v. Smith,* 644 A.2d 1328, 1344 (D.C. 1994) (court may use comparable rental properties to compute fair market value); *720 Lex Acquisition LLC v. Guess? Retail, Inc.,* No. 09-cv-7199, 2014 WL 4184691, at *13 (S.D.N.Y. Aug. 22, 2014) (unpublished opinion) ("[T]he reasonable rental value . . . can and should be approximated by looking to the value of comparable leases . . . ."); *Lu v. Grewal,* 30 Cal. Rptr. 3d 623, 627 (Ct. App. 2005) ("[T]he correct measure for mitigation credit is the property's fair market rental value.").  But, it says, in that case, the court had to account for all the differences in terms between the ballet offer and the existing lease, including that the ballet offer contemplated six months of free rent, $30,000 in a building improvement credit, and no condo fees.

¶ 31    We agree that if the court intended to use the ballet offer itself to calculate damages, it needed to take into account that the ballet offer would have commenced in September 2021; the base rent differential was nearly $1,500 per month; the ballet company would not have paid rent for the first six months, *see Hto7,* 319 A.3d at 382-83 (when substitute lease allows for period of free rent, the original tenant is liable for the rent); the landlord would have

applied a $30,000 credit for improvements, *cf. Richard v. Broussard*, 495 So. 2d 1291, 1293 (La. 1986) (tenant is liable for cost of altering the premises for purposes of re-letting the property to new tenant); and the ballet company would not have paid most of the condo fees and the taxes.[2]

¶ 32    On the other hand, the court may have intended to use the ballet offer as merely a rough benchmark.  But if this was the court's intent, it had to explain how it arrived at that conclusion.

¶ 33    Because we are not certain whether the court's damages award reflects a comparable offer analysis or offsets the landlord's damages specifically by the ballet offer, we reverse and remand for further findings and recalculation of damages.

### D.    Attorney Fees

¶ 34    Lastly, the landlord contends that the trial court abused its discretion when it reduced the attorney fees award by 20%.  We

---

[2] Contrary to the tenant's argument, the landlord did not have to specifically request damages based on the ballet offer's distinct terms.  The landlord is entitled to argue that the trial court was obliged to correctly calculate damages.  *See, e.g., Taylor v. HCA-HealthONE LLC*, 2018 COA 29, ¶¶ 50-52 (where an issue is governed by a particular standard or framework, a party need not preserve an argument that trial court must apply the correct standard or framework).

cannot discern the basis for the court's decision, and therefore we reverse and remand for further findings.

### 1. Attorney Fees Order

¶ 35 To calculate the attorney fees award, the trial court first determined a reasonable hourly rate. The court noted that the landlord's counsel collectively charged from $425 to $620 per hour. It then found that while an hourly rate of $500 was typical of the geographic region where the case was tried, counsel in landlord-tenant disputes typically charge a lower rate. So while it applied a rate of $500 per hour, the court noted that such a rate "should signify greater familiarity with the . . . issues involved."

¶ 36 The court next determined the reasonable number of hours spent on the case. Accounting for the higher hourly rate, the court deducted 139 hours as "excessive."

¶ 37 The court then multiplied the hourly rate by the adjusted number of hours expended and arrived at an initial award of $161,800. *See S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein,* 2014 COA 171, ¶ 23.

¶ 38 Finally, the court reduced the initial award by 20% for an adjusted total award of $129,440. The court found that such an

adjustment was appropriate because the landlord continued throughout the case to litigate its duty to mitigate its losses, and, in the end, it was awarded substantially less than "the entire value of the outstanding term of the lease."

## 2.    Analysis

¶ 39    Neither party challenges the trial court's initial award. Instead, the landlord contends that the trial court's additional downward adjustment constituted "impermissible double counting" because the court also reduced the reasonable hourly rate and number of hours expended.  On this point, we disagree.

¶ 40    The trial court initially adjusted the number of hours expended based on a determination that the issues lacked complexity and therefore counsel could have performed the work in fewer hours.  *See Payan v. Nash Finch Co.*, 2012 COA 135M, ¶ 43 (court may adjust the number of hours expended based on lack of complexity).  In contrast, the court's subsequent 20% across-the-board reduction of the fee award was to account for the "degree of success" achieved.  *Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143, 147-48 (Colo. App. 1996) ("Once the lodestar amount is

determined, that basic amount may be adjusted upward or downward" based on "the degree of success achieved.").

¶ 41     The landlord counters that under the circumstances, the court erred by cutting fees based on the degree of success the landlord achieved in the litigation. On this point, we agree in part.

¶ 42     The court found that the landlord's counsel had unreasonably pursued its liquidated damages argument, only to have that argument rejected by both the trial court and the appellate court. We acknowledge that counsel's continued pursuit of nonmeritorious arguments can justify a downward adjustment. *See, e.g.*, *Hobbs v. EVO Inc.*, 7 F.4th 241, 259 (5th Cir. 2021). But the court did not explain why a 20% reduction overall was justified. And while the trial court properly considered "the amount of damages recovered" by the landlord, *Tallitsch*, 926 P.2d at 148, we have reversed the damages award. Thus, on remand, the court must reconsider this factor in light of the recalculated amount of damages.

### III.   Disposition

¶ 43     The judgment is affirmed in part and reversed in part, the attorney fees order is reversed, and the case is remanded to the trial court for further proceedings.

JUDGE YUN and JUSTICE MARTINEZ concur.